IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

RAPID FUNDING GROUP, INC.,                                    CV 07-1348-PK

                                                             FINDINGS AND
                                                             RECOMMENDATION

                        Plaintiff,

v.


KEYBANK NATIONAL ASSOCIATION,



                        Defendant.
_____

PAPAK, Magistrate Judge:

        This action was filed against defendant KeyBank National Association ("KeyBank") by

plaintiff Rapid Funding Group, Inc. ("RFG"), on September 11, 2007.  RFG's complaint as

originally filed alleged three claims for breach of contract, one claim for negligent

misrepresentation, and one claim for fraud, each arising in connection with two loans extended


Page 1 - FINDINGS AND RECOMMENDATION

by RFG to Trade Base Equipment, Inc. ("TBE"), in purported reliance on various representations allegedly made by KeyBank's then-employee Daniel Roberts regarding TBE's finances. On January 29, 2008, RFG amended its complaint to state a single claim of fraud only. On February 22, 2008, KeyBank answered RFG's amended complaint and brought third-party claims against TBE and TBE's principal, Brett Regal. Default judgment was entered against TBE and Regal on August 7, 2008. This court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), based on the complete diversity of the parties and the amount in controversy.

Now before the court are (i) KeyBank's motion (#113) for summary judgment, (ii) RFG's motion (#114) for partial summary judgment as to KeyBank's vicarious liability for Roberts' actions, as to some, but not all, of the elements of KeyBank's liability for fraud, and as to four of KeyBank's affirmative defenses, and (iii) KeyBank's motion (#139) to strike certain evidence offered by RFG. I have considered the motions, all of the pleadings on file, and oral argument on behalf of the parties. For the reasons set forth below, KeyBank's motion (#113) for summary judgment should be denied, RFG's motion (#114) for partial summary judgment should be denied, and KeyBank's motion (#139) to strike should be denied.

## LEGAL STANDARDS

### I.    Cross Motions for Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is not proper if material factual issues exist for trial. *See*, *e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 318, 322 (1986); *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir.

1995).  The substantive law governing a claim or defense determines whether a fact is material.

*See Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 369 (9th Cir. 1998).

In evaluating a motion for summary judgment, the district courts of the United States

must draw all reasonable inferences in favor of the nonmoving party, and may neither make

credibility determinations nor perform any weighing of the evidence.  *See*, *e.g.*, *Lytle v.

Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990); *Reeves v. Sanderson Plumbing Products,

Inc.*, 530 U.S. 133, 150 (2000).  On cross-motions for summary judgment, the court must

consider each motion separately to determine whether either party has met its burden with the

facts construed in the light most favorable to the other.  *See* Fed. R. Civ. P. 56; *see also*, *e.g.*,

*Fair Hous. Council v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).  A court may not

grant summary judgment where the court finds unresolved issues of material fact, even where the

parties allege the absence of any material disputed facts.  *See id.*

## II.    Motion to Strike

### A.    Federal Civil Procedure Rule 12(f)

Federal Civil Procedure Rule 12 provides that the district courts "may strike from a

pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter"

on their own initiative or pursuant to a party's motion.  Fed. R. Civ. P. 12(f).  The disposition of a

motion to strike is within the discretion of the district court.  *See Federal Sav. & Loan Ins. Corp.

v. Gemini Management*, 921 F.2d 241, 244 (9th Cir. 1990).  Motions to strike are disfavored and

infrequently granted.  *See Stabilisierungsfonds Für Wein v. Kaiser, Stuhl Wind Distribs. Pty.,

Ltd.*, 647 F.2d 200, 201, 201 n.1 (D.C. Cir. 1981); *Pease & Curren Refining, Inc. v. Spectrolab,*

*Inc.*, 744 F. Supp. 945, 947 (C.D. Cal. 1990), *abrogated on other grounds by Stanton Road Ass'n v. Lohrey Enters.*, 984 F.2d 1015 (9th Cir. 1993).

### B.    Inherent Power

It is well established that the district courts enjoy an inherent power to manage and control their own dockets. *See*, *e.g.*, *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936) (affirming "the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants"). It is clear that this inherent power includes the authority to sanction procedural impropriety in an appropriate manner. *See*, *e.g.*, *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991) (noting that "[a] primary aspect" of the courts' inherent power "is the ability to fashion an appropriate sanction for conduct which abuses the judicial process;" holding that because "outright dismissal of a lawsuit . . . is within the court's discretion," in consequence less severe sanctions are "undoubtedly within a court's inherent power as well"); *Atchison, T. & S.F. Ry. v. Hercules Inc.*, 146 F.3d 1071, 1074 (9th Cir. 1998) ("well established that district courts have inherent power to control their dockets and may impose sanctions, including dismissal, in the exercise of that discretion") (citations, internal quotation marks omitted); *see also Lamos v. Astrue*, 2008 U.S. App. LEXIS 9143 (9th Cir. 2008) (unpublished disposition) (affirming inherent power of the courts to strike documents other than pleadings from the docket); *Centillium Communs., Inc. v. Atl. Mut. Ins. Co.*, 2008 U.S. Dist. LEXIS 20719 (D. Cal. 2008) (striking a procedurally improper motion pursuant to the court's inherent power).

## FACTUAL BACKGROUND

RFG is a private moneylender based in Wilsonville, Oregon.  Its principal is Randy Rugg.

In December 2006, Rugg was introduced to Brett Regal, the principal of TBE, in connection with

a sugar beet seed transaction.  In the course of that transaction, RFG provided $200,000 to Lorre

Huffe, the CFO of a Regal-affiliated company called Jade Global Trading, requiring in return a

promissory note scheduled to become due and payable in the amount of $235,000 on January 10,

2007, and with signature lines for both Regal and one of his associates, Lee Gunkelman.

Gunkelman signed the promissory note, but it appears that Regal did not.  The Gunkelman loan

was never repaid.

In January 2007, apparently on the same day that the Gunkelman loan defaulted, Rugg

and Regal began considering two new financing deals, pursuant to which TBE would purchase a

bio-diesel plant and an oil refinery in transactions to be "brokered" by RFG.  Neither deal

ultimately closed.

In February 2007, at Regal's request but in Regal's absence, Rugg instructed one of his

employees to notarize Regal's signature to a document representing that Regal was the

"beneficial owner of $195,000."  Rugg then forwarded the notarized document to a London

securities firm in furtherance of an investment deal Regal was pursuing there.  Also in February

2007, RFG lent Jade Global an additional $350,000 in exchange for Jade Global's promissory

note for $500,000, to come due March 13, 2007, and an assignment of Jade Global's rights in a

letter of credit as collateral.  Jade Global defaulted on the loan, and RFG was forced to pursue a

claim against the assigned letter of credit.

In March 2007, at or around the time Jade Global defaulted on its RFG loan, Regal

contacted Daniel Roberts, who at that time was KeyBank's Assistant Vice President and Business

Banking Relationship Manager, regarding the possibility of obtaining loans from KeyBank.  In

early April 2007, Roberts set up a conference call among himself, Regal, and Roberts' superior at

KeyBank, Matthew Wyner, to discuss the proposed loans.  Following the conference call,

KeyBank declined to extend the requested loans.

On April 13, 2007, Roberts prepared and signed two letters regarding Regal, his standing

as a KeyBank customer, and his "access" to funds with KeyBank.  Each was printed on letterhead

bearing the KeyBank logo (but without displaying contact information for any KeyBank

employee), each was addressed "To whom it may concern," and each stated that Regal "is in

excellent standing with KeyBank."  The first stated, in addition, that Regal "has access to over

$10,000,000 with KeyBank," whereas the second stated that Regal "has access to over

$30,000,000 with KeyBank."  These dollar amounts constitute the only difference between the

two letters of April 13, 2007.  Regal testified in deposition that he requested that Roberts prepare

such a letter in connection with a real estate transaction he was contemplating (a transaction that

did not involve RFG or its principal).  Regal testified that although Roberts prepared both letters,

he subsequently advised Roberts that only the letter referring to $10 million in accessible funds

would be necessary.

Also on April 13, 2007, TBE opened an account with KeyBank, ostensibly for the

purpose of receiving a $35.6 million wire transfer purportedly scheduled to take place on April

20, 2007.[1]  Later in April 2007, Roberts prepared and signed a third letter addressed "To Whom

It May Concern" in connection with TBE's purportedly pending wire transfer.  The third letter

---

[1] In fact, the wire transfer never took place.

(the "BTCI letter") was undated and was printed on letterhead bearing the KeyBank logo with

Roberts' contact information typed on.  It stated as follows:

> I verify on behalf of KeyBank Association that a wire transfer in the amount of
> $35,610,000.00 US dollars has been verified and is pending delivery to [TBE's
> KeyBank account number] from Banquetogolaise [*sic*] Pour le Commerce Et
> L'Industrie (BCTI Togo) and will be released into the above mentioned account
> upon payment of the 1% Value Added Tax (VAT) of $350,610.00 US dollars.

It is not clear to whom Roberts provided the BTCI letter, although it appears he may have given

it directly to Regal.  By not later than April 24, 2007 – by which time the "pending" wire transfer

was already overdue – Eddie Dierickx of RFG was in possession of a copy of the BTCI letter.

Dierickx left a voicemail message for Roberts on April 24, 2007, indicating that he had been

forwarded a copy of the BTCI letter by Regal, and asking to speak with Roberts about it.  On

April 25, 2007, Dierickx emailed Roberts, asking him for a copy of the letter printed to "official"

KeyBank letterhead, for information regarding the chain of banks that would be involved in

processing the wire transfer and the purported VAT payment, and for documentation from

KeyBank's "international department" indicating that the "source and funds are viable and the

transaction is secured."  Roberts apparently faxed an additional copy of the BTCI letter to

Dierickx, but did not provide any of the remaining requested information.

On April 27, 2007, without having received the information requested by Dierickx from

Roberts or KeyBank, RFG lent TBE $310,000 ("Loan 1"), and TBE promised to pay RFG

$664,750 within sixty days thereafter.

Approximately three weeks later, before Loan 1 was scheduled to be repaid – and with

the purportedly pending wire transfer still unconsummated – TBE requested a second, more

substantial loan ("Loan 2"), in connection with which the repayment terms of Loan 1 would be

Page 7 - FINDINGS AND RECOMMENDATION

renegotiated.  The parties purportedly contemplated that the proceeds of Loan 2 would be used to finance the costs of shipping crude oil from Nigeria to the United States for refining.  On May 17, 2007, Roberts emailed an unsigned copy and faxed a signed copy of a letter (printed to what appears to be "official" KeyBank letterhead) to David Samuels of a shipping company called Marcons Group Ltd. (the "Marcons letter"), stating in part as follows:

> Our client Mr. Regal of Trade Based [*sic*] Equipment has the capability to transact the sales/purchase agreement CIF crude oil from the NNPC Bonny Ocean terminal Bonny to its American destination of wither Louisiana Port terminal or the Huston [*sic*] TX, Terminal.

> The contract calls for two million barrels a month to be transported CIF to the refinery.  The payment on this contract will be available forty five days after product has left its origination port and successfully been verified and transferred to our refineries [*sic*] holding tanks.

The record contains no evidence to suggest that Roberts or KeyBank ever sent the Marcons letter to Rugg or RFG.

RFG lent TBE an additional $1.445 million between May 17 and May 25, 2007, effecting the contemplated Loan 2 transaction.  In exchange, TBE agreed to pay RFG $5,000,000 in satisfaction of both Loan 1 and Loan 2 within ninety days of the date of Loan 2.  TBE defaulted on its repayment obligations, and this action followed.

## ANALYSIS

### I.    Dispositive Motions

To prevail in its action against KeyBank, RFG must establish not merely each of the elements of a claim for fraud but also the elements of KeyBank's vicarious liability for Roberts' alleged actions.  KeyBank now moves for summary judgment, as to both vicarious liability and each of the following necessary elements of a fraud claim:  that KeyBank intended RFG to rely

on Roberts' representations, that RFG was ignorant of the fact that Roberts' representations were false, that RFG had a right to rely on Roberts' representations, that RFG did rely on Roberts' representations, and that RFG's reliance caused its alleged damages.

For its part, RFG moves for partial summary judgment as to KeyBank's vicarious liability and as to the requisite elements that false, material representations were made, that KeyBank was aware of the representations' falsity, that KeyBank intended RFG to rely on the false representations, and that RFG was damaged in consequence of its reliance on the representations. In addition, RFG moves for dismissal of KeyBank's affirmative defenses of unclean hands, failure to mitigate, lack of standing, and real party in interest.

In this diversity action, the court will apply the substantive law of the State of Oregon, although the action remains governed by federal procedural law. *See, e.g., Gasperini v. Ctr. for Humanities*, 518 U.S. 415, 427 (1996)

### A.    Vicarious Liability

RFG argues that KeyBank is, as a matter of law, vicariously liable for Roberts' actions both on a theory of principal liability and on a theory of employer liability.

### 1.    Principal Liability

Oregon law recognizes that a principal may be bound by or liable for its agent's actions under specified circumstances:

> Generally speaking, an agent can bind a principal only when that agent acts with actual or apparent authority.  . . .  Actual authority may be express or implied. When a principal explicitly authorizes the agent to perform certain acts, the agent has express authority.  However, most actual authority is implied:  a principal implicitly permits the agent to do those things that are reasonably necessary for carrying out the agent's express authority.  . . .  In contrast, a principal also may be bound by actions taken that are completely outside of the agent's actual authority,

Page 9 - FINDINGS AND RECOMMENDATION

if the principal allows the agent to appear to have the authority to bind the principal. Such a circumstance is called "apparent authority." . . .

**For a principal to be bound by an agent's action, the principal must take some affirmative step, either to grant the agent authority or to create the appearance of authority.** An agent's actions, standing alone and without some action by the principal, cannot create authority to bind the principal. Thus,

> apparent authority to do any particular act can be created only by some conduct of the principal which, when reasonably interpreted, causes a third party to believe that the principal consents to have the apparent agent act for him on that matter.

. . . Additionally, the third party must rely on that belief when dealing with the agent. . . .

*Taylor v. Ramsay-Gerding Constr. Co.*, 345 Or. 403, 409-410 (2008) (emphasis supplied; citations, modifications, and some internal quotation marks omitted). Moreover, "it is well established that one cannot rely upon an agent's apparent authority when he knows that the agent does not have actual authority or had knowledge of facts which would put him on inquiry as to the actual authority of the agent." *Minniti v. Cascade Employers Asso.*, 280 Or. 319, 329 (1977), *citing Portland v. American Surety Co.*, 79 Or. 38, 43-44 (1915).

"[A]pparent authority can be created by appointing a person to a position, such as that of manager or treasurer, which carries with it generally recognized duties; to those who know of the appointment there is apparent authority to do the things ordinarily entrusted to one occupying such a position, regardless of unknown limitations which are imposed upon the particular agent." *Badger v. Paulson Inv. Co.*, 311 Or. 14, 25 (1991), *quoting* Restatement (Second) Agency § 27, comment a at 104 (1958).

Here, the parties are in agreement that Roberts lacked actual authority to make statements to third parties on KeyBank's behalf regarding KeyBank customers' account balances, financial

capabilities, or credit availability.  The parties disagree, however, as to whether Roberts had

apparent authority to make such statements.  RFG argues that KeyBank's actions cloaked Roberts

with apparent authority to attest to KeyBank's customers' financial capabilities when it conferred

on him the titles of Assistant Vice President and Business Banking Relationship Manager, as

well as the job duties associated with those titles, and when it gave him actual authority to

communicate with third parties, for at least some purposes, using KeyBank letterhead and other

KeyBank resources.  KeyBank opposes that argument, and additionally argues that RFG was "on

inquiry" as to whether Roberts' actions exceeded the scope of his authority because it had actual

knowledge – as arguably evidenced by, *inter alia*, the Dierickx voicemail message of April 24,

2007 – that someone with Roberts' job titles could not properly make the attestations contained

within his statements.

### a.    KeyBank's Motion for Summary Judgment

KeyBank's motion for summary judgment may not properly be granted as to the question

of principal liability.  Neither party offers evidence as to the job duties generally recognized as

being entrusted to persons sharing Roberts' job titles, nor is the issue of job duties ordinarily

entrusted to such persons a fit matter for judicial notice.  Construing the facts in the record in the

light most favorable to RFG and drawing all reasonable inferences in RFG's favor, and in the

absence of evidence tending to prove that persons with Roberts' job titles are ordinarily not

entrusted with authority to issue opinions regarding customer finances, a jury could reasonably

find that Roberts had apparent authority to issue such opinions on KeyBank's behalf.

Moreover, again construing all facts and drawing all inferences in RFG's favor, there

remain unresolved issues of material fact as to whether RFG was on inquiry regarding whether

Page 11 - FINDINGS AND RECOMMENDATION

Roberts' actions exceeded the scope of his actual authority.  On April 24, 2007, RFG's employee

Dierickx called Roberts to request additional information from him, including a copy of the

BTCI letter printed to "official" KeyBank letterhead, information regarding the chain of banks

that would be involved in processing the wire transfer and the purported VAT payment, and

documentation from KeyBank's "international department" indicating that the "source and funds

are viable and the transaction is secured."  On this record, a jury could reasonably find that the

additional requested information was intended to bolster RFG's comfort with the proposed loan

transaction, rather than to ensure that Roberts' attestations regarding TBE's financial capabilities

were verified by someone with appropriate actual authority.  In the event a finder of fact reached

this reasonable conclusion, the Dierickx voicemail message would not provide support for

KeyBank's position that RFG was on inquiry notice as to the scope of Roberts' actual authority.

KeyBank further argues that RFG was necessarily on inquiry notice as to the scope of

Roberts' actual authority based on its knowledge of TBE's prior business dealings with it, its

knowledge that the "pending" wire transfer referred to in the BTCI letter was overdue, and its

familiarity with standard banking practices.  However, the record contains no evidence

establishing RFG's actual knowledge that persons with Roberts' job titles are not authorized to

opine as to customers' financial capabilities, and neither RFG's knowledge of TBE's history of

defaulting on loans nor its knowledge that the wire transfer had not taken place as scheduled has

any bearing on Roberts' apparent authority.

For the foregoing reasons, KeyBank's motion for summary judgment should be denied as

to the question of vicarious liability to the extent premised on KeyBank's principal-agent

relationship with Roberts.

Page 12 - FINDINGS AND RECOMMENDATION

### b.    RFG's Motion for Partial Summary Judgment

Similarly, RFG's motion for partial summary judgment should not be granted as to the question of principal liability.  As noted above, neither party offers evidence as to the job duties generally recognized as being entrusted to persons sharing Roberts' job titles, and the issue of job duties ordinarily entrusted to such persons is not a fit matter for judicial notice.  Construing the facts in the record in the light most favorable to KeyBank and drawing all reasonable inferences in KeyBank's favor, and in the absence of evidence tending to prove that persons with Roberts' job titles are ordinarily entrusted with authority to issue opinions regarding customer finances, a jury could reasonably find that Roberts lacked apparent authority to issue such opinions on KeyBank's behalf.  Because there is an unresolved issue of material fact as to whether KeyBank's actions were sufficient to cloak Roberts with relevant apparent authority, RFG's motion for partial summary judgment, like KeyBank's dispositive motion, should be denied as to the question of vicarious liability to the extent premised on KeyBank's principal-agent relationship with Roberts.

### 2.    Employer Liability

Oregon law further recognizes that, under appropriate circumstances, an employer may be liable for its employee's tortious actions:

> Under the doctrine of *respondeat superior*, an employer is liable for an employee's torts when the employee acts within the scope of employment.  Negligence or other tortious conduct by the employer is not required. . . .
>
> Three requirements must be met to conclude that an employee was acting within the scope of employment.  These requirements traditionally have been stated as: (1) whether the act occurred substantially within the time and space limits authorized by the employment; (2) whether the employee was motivated, at least partially, by a purpose to serve the employer; and (3) whether the act is of a kind

which the employee was hired to perform.

*Chesterman v. Barmon*, 305 Or. 439, 442 (1988) (citations omitted).  Employee conduct need not

be authorized by the employer to fall within the scope of employment:

> The argument [that an employee's conduct was "in direct *contravention* of the
> employer's policies and directive" and therefore cannot have been within the scope
> of employment] misses the point.  Tortious conduct undoubtedly is seldom part of
> an employee's duties.  Nevertheless, whether an employee acts within the scope of
> employment depends on whether the servant at the time of the commission of the
> injury was performing a service for the master in furtherance of the master's
> business, not whether it was done in exact observance of detail prescribed by his
> employer.

*Banaitis v. Mitsubishi Bank*, 129 Or. App. 371, 392 (Or. Ct. App. 1994) (emphasis original;

internal quotation marks omitted), *quoting Stroud v. Denny's Restaurant*, 271 Or. 430, 437

(1975), *quoting Tyler v. Moore et al.*, 111 Or. 499, 509 (1924); *see also Newkirk v. Oregon-*

*Washington R. & N. Co.*, 128 Or. 28, 38 (1928) ("when an employee does in the course of his

employment a duty in an improper manner his employer is liable for any consequent injury, even

though the employee disobeyed his orders.  'A master is liable for the acts of his servant done

within the scope of his authority, although the servant disobeyed instructions.'), *quoting French*

*v. Cresswell*, 13 Or. 418, 425 (1886).  The Oregon Supreme Court has specified that "the

question of whether or not an employee has acted within the scope of his employment at any

given time is normally a question for the jury, except in cases where only one reasonable

conclusion can be drawn from the facts."  *Stanfield v. Laccoarce*, 284 Or. 651, 655 (1978)

(citations omitted).

      Here, the first element of *respondeat superior* liability – whether Roberts' actions took

place "substantially within the time and space limits authorized by [his] employment" – is not in

Page 14 - FINDINGS AND RECOMMENDATION

serious question.  The parties chiefly dispute whether Roberts' actions were of a kind he was hired to perform, and, to a lesser extent, whether Roberts was motivated at least in part by a purpose to serve KeyBank.

### a.    KeyBank's Motion for Summary Judgment

Construing the facts in the record in the light most favorable to RFG and drawing all reasonable inferences in RFG's favor, KeyBank's motion for summary judgment is not well taken as to its vicarious liability for Roberts' actions on a theory of *respondeat superior*, and should be denied to the extent it requests a finding of no liability on that theory.  As noted above, there is no serious dispute as to whether Roberts' statements were made substantially within the time and space limits authorized by his employment.  Moreover, there is evidence in the record from which a jury could reasonably find that Roberts was motivated, at least in part, by a purpose to serve his employer:  Roberts testified in deposition that "I thought I was doing my job to bring in new business and . . . a large deal that I was told was good."  Finally, a jury could reasonably find that Roberts' actions in attesting to TBE's financial capabilities and resources were of a kind which he was hired to perform, where it is undisputed that it was among Roberts' job responsibilities to service KeyBank clients, to secure deposits for the bank, and, generally, to cultivate business relationships with and for KeyBank customers.

KeyBank's primary argument on this issue – that Roberts' actions cannot have been of a kind he was hired to perform because they were outside his actual authority – falls directly afoul of applicable case law.  *See, e.g., Banaitis*, 129 Or. App. at 392 ("whether an employee acts within the scope of employment depends on whether the servant at the time of the commission of the injury was performing a service for the master in furtherance of the master's business, not

Page 15 - FINDINGS AND RECOMMENDATION

whether it was done in exact observance of detail prescribed by his employer"); *see also*, *e.g.*, *Stroud*, 271 Or. at 437; *Tyler*, 111 Or. at 509; *Newkirk*, 128 Or. at 38; *French*, 13 Or. at 425. The fact that Roberts was expressly not authorized to issue opinions as to TBE's financial capabilities is immaterial to the *respondeat superior* analysis, given the uncontroverted evidence in the record establishing that his actions were nevertheless performed in furtherance of KeyBank's business.

For the foregoing reasons, KeyBank's motion for summary judgment should be denied as to the question of vicarious liability to the extent premised on KeyBank's employer-employee relationship with Roberts.

### b.    RFG's Motion for Partial Summary Judgment

As noted above, the question whether an employee has acted within the scope of his employment is ordinarily a question of fact to be resolved by a jury, "except in cases where only one reasonable conclusion can be drawn from the facts." *Stanfield*, 284 Or. at 655 (citations omitted). This case does not present such a circumstance, although the facts in the record come very near to requiring the conclusion that Roberts was, in fact, acting within the scope of activities he was hired to perform when he made statements regarding TBE's financial capabilities.

No evidence in the record supports the conclusion that Roberts made his allegedly actionable statements outside the time and space limits authorized by his employment. Indeed, the statements were made on KeyBank letterhead and/or were transmitted on KeyBank's telecommunications equipment. Similarly, no evidence in the record suggests that Roberts lacked any purpose to serve KeyBank when he made the statements: the only material evidence

Page 16 - FINDINGS AND RECOMMENDATION

on this point tends to establish that Roberts believed he was "doing [his] job to bring in new business and . . . a large deal" at the time the statements were made.  Roberts Depo., 234:24-25. The sole issue is whether the evidentiary record precludes the inference that Roberts' statements fall outside the scope of activities he was hired to perform.

Although it was undisputedly among Roberts' job responsibilities to service KeyBank clients, to secure deposits for the bank, and, generally, to cultivate business relationships with and for KeyBank customers, I cannot say, based on the record currently before the court, that no jury could reasonably conclude that the statements were outside the scope of Roberts' employment.  The documents in the record do not conclusively define the scope of Roberts' rights and responsibilities as KeyBank's Assistant Vice President and Business Banking Relationship Manager, and it is undisputed that Roberts was expressly not authorized to issue statements as to client financial capabilities.  A finder of fact could, at the margin, reach the conclusion that Roberts went outside the scope of the activities he was hired to perform when he prepared letters containing statements as to TBE's financial capabilities and addressed either "To whom it may concern" (the letters of April 13, 2007, and the BCTI letter) and/or to non-customers of  KeyBank (the Marcons letter).

For the foregoing reasons, RFG's motion for partial summary judgment should be denied as to the question of vicarious liability to the extent premised on KeyBank's employer-employee relationship with Roberts.

**B.    Fraud**

The elements of a claim for fraud under Oregon law are:  "(1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5)

Page 17 - FINDINGS AND RECOMMENDATION

his intent that it should be acted on by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; and (9) his consequent and proximate injury." *Webb v. Clark*, 274 Or. 387, 391 (1976); *Johnsen v. Mel-Ken Motors*, 134 Or. App. 81, 89 (1995).[2]  In regard to the ninth enumerated element, damages caused by the fraud, the focus "is on whether the plaintiff's reasonable reliance on the defendant's false representation caused harm to the plaintiff." *Westerberg v. Mader*, 182 Or. App. 150, 155 (2002).

"Fraud must be proved by clear and convincing evidence. Clear and convincing evidence means that the truth of the facts asserted is highly probable." *Coy v. Starling*, 53 Or. App. 76, 80 (Or. Ct. App. 1981), *citing*, *e.g.*, *Krause v. Eugene Dodge, Inc.*, 265 Or. 486, 502 (1973).  "If any one of the[] elements [of a cause of action for fraud] is not established by clear and convincing evidence, [the fraud] plaintiff's case must fail." *Id.*, *quoting Webb v. Clark*, 274 Or. 387, 391 (1976).

### 1.    KeyBank's Motion for Summary Judgment

KeyBank moves for summary judgment on the ground that RFG cannot prove five of the nine elements of fraud: (i)  that KeyBank intended RFG to rely on Roberts' representations, (ii) that RFG was ignorant of the fact that Roberts' representations were false, (iii) that RFG relied on Roberts' representations, (iv) that RFG had a right to rely on Roberts' representations, and (v) that RFG's reliance caused its alleged damages.  For the following reasons, KeyBank's motion for summary judgment as to RFG's fraud claim should be denied.

---

[2]  As noted by the parties, some Oregon courts consolidate the nine elements of a claim for fraud down to a list of five, but the same essential requirements are present whether enumerated as five or nine elements.

### a.    Intent that RFG Should Rely on Roberts' Representations

Under Oregon law, the "requisite intent to mislead consists of a defendant misrepresenting a material fact for the purpose of misleading the other party or with the knowledge he is misleading the other party, or in reckless disregard of the fact he is misleading the other party." *United States Nat'l Bank v. Fought*, 291 Or. 201, 223 (1981), *quoting Elizaga v. Kaiser Foundation Hospitals, Inc.*, 259 Or. 542, 547-548 (1971).

> Unlike in a negligence claim where a defendant may assume a duty to more than one person or to a class of persons, the intrinsic nature of a claim of promissory fraud is such that it protects the interests only of those to whom a promise is made specifically and directly.  That is because the requisite intent to mislead in a fraud claim consists of a defendant misrepresenting a material fact for the purpose of misleading the other party.

*Schwarz v. Philip Morris Inc.*, 206 Or. App. 20, 40-41 (Or. Ct. App. 2006), *citing* Fought, 291 Or. at 225.  Nevertheless, "a person who makes a misrepresentation may be liable to the intended recipients of a misrepresentation without regard to whether the person making the representation intends to defraud a particular person." *Id.* at 41, *quoting Williams v. Philip Morris*, 182 Or. App. 44, 53 (Or. Ct. App. 2002).  "What matters is whether the representation was intended ultimately for the public or for a particular class of persons to which the plaintiff belongs." *Id.*, *citing Williams*, 182 Or. App. at 53-55.

KeyBank argues that a reasonable trier of fact could not conclude that KeyBank intended RFG to rely on Roberts' representations, because three of the four letters prepared by Roberts that contained his attestations regarding TBE were neither addressed to RFG nor provided to RFG directly by Roberts or otherwise by KeyBank.  With regard to the BTCI letter, which *was* provided directly to RFG by Roberts, KeyBank argues that the text of the letter contains no

suggestion that RFG was intended to rely on the truth of its representations.  Neither argument is

sufficient to establish KeyBank's right as a matter of law to summary judgment on RFG's fraud

claim.

Construing the facts in the light most favorable to RFG and drawing all reasonable

inferences in RFG's favor, the record does not foreclose the possibility that Roberts specifically

intended RFG to rely on the representations contained in the BTCI letter.  Roberts sent the BTCI

letter directly to RFG on KeyBank letterhead, and discussed the representations it contained with

RFG employee Dierickx.  The record is void of any suggestion that he did not intend RFG to rely

on his representations.  In consequence, KeyBank is not entitled to summary judgment on RFG's

fraud claim based on the theory that Roberts did not intend RFG to rely on the representations

contained within the BTCI letter.

With regard to the remaining three letters, there are unresolved questions of material fact

as to whether Roberts intended the reliance of a class of persons to which RFG belonged.  Regal

requested that Roberts prepare the letters of April 13, 2007, specifically in connection with

Regal's contemplated purchase of residential real estate, and there is no evidence in the record to

suggest that Roberts intended the Marcons letter to go to anyone other than Marcons.  However,

Roberts testified in deposition that he understood the letters of April 13, 2007, and the Marcons

letter would be read by "other people" for the purpose of "facilitating deals."  Construing this

evidence in the light most favorable to RFG and drawing all reasonable inferences in RFG's

favor, a finder of fact could reasonably conclude that Roberts intended persons with whom TBE

was transacting business to rely on the representations contained within the letters of April 13,

2007, and the Marcons letter.  In consequence, KeyBank is not entitled to summary judgment on

RFG's fraud claim based on the theory that Roberts did not intend RFG to rely on the representations contained within those letters.

        **b.**      **RFG's Ignorance of the Falsity of Roberts' Representations**

KeyBank argues that RFG's knowledge of the falsity of Roberts' representations regarding TBE's financial capabilities must be presumed as a matter of law, because RFG was TBE's *de facto* business partner.  In support of the proposition that RFG and TBE were effectively partners, KeyBank points to the two entities' business dealings prior to the loans here at issue (namely, the failed sugar beet seed transaction, and the failed refinery and bio-diesel plant transactions), to Rugg's use of an RFG employee to notarize documents for Regal *in absentia*, and to the existence of an unsigned partnership agreement between Rugg and Regal.  KeyBank is correct that the evidence compels the conclusion that TBE and RFG had a long-standing business relationship that pre-dated the transactions at issue here, and that it is possible to infer from the existence of their pre-existing relationship that RFG had knowledge of the true state of TBE's financial capabilities.  However, construed in the light most favorable to RFG, KeyBank's evidence establishes merely that RFG and TBE had entered into business transactions together and that one or more of them had contemplated entering into a partnership with the other, not that the two entities or their principals were actual or *de facto* partners for purposes of Loan 1 or Loan 2.  Consequently, there is no basis for presuming as a matter of law RFG's knowledge of the falsity of Roberts' representations.

KeyBank further argues that, at a minimum, RFG cannot have been unaware of the falsity of Roberts' representations at the time it agreed to enter into the Loan 2 transaction, because by that time the business deal underlying Loan 1 had already failed.  However, at that time the Loan

Page 21 - FINDINGS AND RECOMMENDATION

1 transaction itself had not failed, in that Loan 2 was negotiated before repayment was due on

Loan 1 (and, indeed, the repayment obligations of Loan 2 superceded the repayment obligations

of Loan 2).  Moreover, the fact that the wire transfer did not come through following the issuance

of Loan 1 is not sufficient as a matter of law to establish that RFG knew Roberts' representations

regarding the wire transfer to be false, because the record contains evidence suggesting that

Regal provided RFG with an explanation for the delay, suggesting that the wire transfer remained

pending but that the Togolese government had imposed additional conditions on the release of

funds, conditions that would be met with the proceeds of Loan 2.

Construing the facts in the light most favorable to RFG and drawing all reasonable

inferences in RFG's favor, the record does not foreclose the possibility that RFG was ignorant of

the falsity of Roberts' representations at the time it entered into either the Loan 1 or the Loan 2

transaction.  In consequence, there remain unresolved issues of fact as to the "hearer's ignorance

of its falsity" element of RFG's claim for fraud.  KeyBank is therefore not entitled to summary

judgment as to the fraud claim on the theory that RFG was aware of the falsity of Roberts'

representations.

### c.    RFG's Reliance

Although KeyBank clearly indicates that it intends to move for summary judgment on

RFG's fraud claim on the ground that RFG did not actually rely on Roberts' representations, it

offers no argument and points to no evidence in support of this proposition.  It is RFG's

unambiguous position that it did, in fact, rely on Roberts' representations when it entered into

Loan 1 and Loan 2.  Because there clearly remain unresolved issues of fact as to this element of

RFG's claim for fraud, KeyBank is not entitled to summary judgment as to the fraud claim on the

Page 22 - FINDINGS AND RECOMMENDATION

theory that RFG did not rely upon Roberts' representations.

### d.    Reasonable Reliance

The "right to rely" element of a cause of action for fraud requires that the plaintiff's reliance on the defendant's false representations be reasonable.  *See*, *e.g.*, *Or. Pub. Emples. Ret. Bd. v. Simat, Helliesen & Eichner*, 191 Or. App. 408, 424-427 (Or. Ct. App. 2004).  Specifically, such "[r]eliance in fact must be reasonable, but such reasonableness is measured in the totality of the parties' circumstances and conduct."  *Id.* at 428.

There is significant evidence in the record to suggest that RFG's reliance on Roberts' representations, if any, was unreasonable in "the totality of the parties' circumstances and conduct."  RFG presents itself as a sophisticated lender specializing in extending loans to parties who do not qualify for more traditional financing.  Nevertheless, RFG performed no due diligence regarding Loan 1 and Loan 2 other than to verify that the wire transfer was purportedly pending and to verify Roberts' employment by KeyBank.  Indeed, by the time it extended Loan 2, it already had good reason to doubt the accuracy of Roberts' representation that the wire transfer was pending.  KeyBank notes that RFG never attempted to perform a credit check of Regal or TBE, and that it never sought security or even proper documentation for the loans to TBE.  KeyBank further notes that RFG did not request formal verification of TBE's deposits with KeyBank, or request an opportunity to review TBE's financial records.

Moreover, RFG's prior dealings with TBE at the time the loans were extended also strongly suggested that more than routine due diligence would be prudent in any further business transactions with TBE and/or Regal.  At the time the loans herein at issue were extended, RFG had already seen Jade Global default on repayment obligations, and had seen several of Regal's

Page 23 - FINDINGS AND RECOMMENDATION

proposed transactions fall through or otherwise fail, without seeing any successful transactions

involving Regal.  In addition, RFG was necessarily aware that Roberts and KeyBank had failed

to provide the additional confirming information that RFG had specifically and expressly

requested on April 24, 2007.  The great weight of all of this evidence necessarily casts a degree

of doubt on RFG's ability to establish by clear and convincing evidence that its reliance on

Roberts' representations was reasonable.

Nevertheless, the record now before the court does not permit me to conclude that no jury

could reasonably find that RFG's reliance was reasonable.  RFG argues that, in light of the

disparity between the parties' resources and access to information regarding the state of TBE's

finances, it was reasonable for it to rely on KeyBank's representations in conducting its due

diligence.  While this appears a slender thread for RFG's case to depend from, a jury could, at the

margin, reasonably accept it.  Because there is necessarily an unresolved question of material fact

as to the reasonableness of RFG's reliance, if any, on Roberts' representations, KeyBank is not

entitled to summary judgment on RFG's fraud claim on the theory that RFG's reliance was

unreasonable as a matter of law.

### e.    Causation

KeyBank argues, essentially, that RFG's reliance on Roberts' representations could not

have caused RFG's loss, but rather that the loss was caused by the allegedly patent

*unreasonableness* of RFG's reliance.  However, it is RFG's position that but for Roberts'

representations it would not have extended Loan 1 or Loan 2 to TBE.  Moreover, I concluded

above that there is necessarily an unresolved question of material fact as to the reasonableness of

RFG's reliance.  In consequence, there is necessarily an unresolved question of material fact as to

Page 24 - FINDINGS AND RECOMMENDATION

the causation of RFG's damages.  KeyBank is therefore not entitled to summary judgment on

RFG's fraud claim on the theory that RFG's damages were not caused by its reliance on Roberts'

representations.

**2.    RFG's Motion for Partial Summary Judgment**

RFG moves for partial summary judgment as to eight of the nine elements of a claim for

fraud, arguing that the evidence in the record establishes as a matter of law that KeyBank,

through its agent Roberts, (i) made representations which were both (ii) false, and (iii) material

while (iv) aware of their falsity and (v) intending that RFG rely upon them, that (vi) RFG was

unaware that the representations were false, and (vii) relied on them to its (viii) consequent

detriment.  RFG asserts that only the reasonableness of its alleged reliance raises a question of

fact for decision by a jury.

A number of courts have discussed the propriety of a motion for partial summary

judgment brought by a claiming party as to less than all of the elements of liability for a single

cause of action.  The court in *Capitol Records, Inc. v. Progress Record Distributing, Inc.*, 106

F.R.D. 25 (N.D. Ill. 1985), determined that to move for partial summary judgment as to only a

subset of the elements of liability on a claim was a "fatal defect" that could not be cured by

"[f]raming the motion as one for partial summary judgment."  *Capitol Records*, 106 F.R.D. at 28.

Similarly, in *SEC v. Thrasher*, 152 F. Supp. 2d 291 (S.D.N.Y. 2001), the court held that "[t]he

plain language of Federal Rule of Civil Procedure 56 indicates that it is not appropriate to use

summary judgment as a vehicle for fragmented adjudication of non-determinative issues," and

denied a motion for partial summary judgment as to less than all of the elements of liability for a

single cause of action.  *Thrasher*, 152 F. Supp. 2d at 295.  In *City of Wichita v. United States*

Page 25 - FINDINGS AND RECOMMENDATION

*Gypsum Co.*, 828 F. Supp. 851 (D. Kan. 1993), *rev'd on other grounds*, 72 F.3d 1491 (10th Cir.

1996), the court held that "Rule 56(c) authorizes only the entry of judgments on claims, not

single issues or elements that are not dispositive of judgment on those claims," *Wichita*, 828 F.

Supp. at 869, and in *Arado v. General Fire Extinguisher Corp.*, 626 F. Supp. 506 (N.D. Ill.

1985), the court held that "Rules 56(a) and 56(b) simply do not permit the piecemealing of a

single claim. . . ," *Arado*, 626 F. Supp. at 509.  By contrast, the Ninth Circuit permits summary

judgment as to "issues," presumably including elements of causes of action, within the narrow

context of *res judicata* or collateral estoppel.  *See, e.g., Robi v. Five Platters, Inc.*, 918 F.2d

1439, 1441-1442 (9th Cir. 1990).

Federal Civil Procedure Rule 56(d)(2) provides, in its entirety, that "[a]n interlocutory

summary judgment may be rendered on liability alone, even if there is a genuine issue on the

amount of damages."  The implication of Rule 56(d)(2) is that summary judgment may not

properly issue as to mere elements of liability.  I therefore concur with the courts concluding that,

other than determining the preclusive effect of prior proceedings, piecemeal adjudication of less

than all of the elements of liability for a single cause of action is not permitted under Rule 56.

For this reason, I recommend that RFG's motion for partial summary judgment as to some but not

all of the elements of a claim for fraud be denied.

### C.    KeyBank's Affirmative Defenses

RFG moves for dismissal of KeyBank's affirmative defenses of unclean hands, failure to

mitigate, lack of standing, and real party in interest.

### 1.    Unclean Hands

RFG argues that KeyBank's unclean hands defense must be dismissed, because unclean

hands is an equitable doctrine not recognized in or applicable to actions at law, such as this one.

KeyBank responds with the assertions that the "companion principle" of *in pari delicto* is

applicable to legal actions, and, moreover, that the Oregon courts treat the two maxims

interchangeably.

In *McKinley v. Weidner*, 73 Or. App. 396, 400 (Or. Ct. App. 1985), the Oregon court of

appeals was confronted with the situation in which a plaintiff's claim for money damages was

dismissed by the trial court below pursuant to the unclean hands doctrine.  The appeals court

performed an *in pari delicto* analysis and determined that the claim was not barred by that

doctrine, and on that basis reversed the trial court's dismissal.  I conclude that KeyBank is

correct, and that the Oregon courts treat the two defenses interchangeably.  KeyBank's unclean

hands defense should therefore not be dismissed, but rather should be construed as an *in pari

delicto* defense.  RFG's motion for partial summary judgment should consequently be denied as

to KeyBank's unclean hands defense.

### 2.    Duty to Mitigate

RFG argues that KeyBank's duty to mitigate affirmative defense should be dismissed

because the duty to mitigate did not arise until RFG was aware of its losses, and by that time it

was already too late to take effective action.  However, RFG's argument presumes the resolution

in its favor of several unresolved issues of material fact.  Moreover, a finder of fact could

reasonably find on the record now before the court that at least some of RFG's payments to TBE

took place after indicia of TBE's inability or unwillingness to repay its loan obligations were

strong and mounting.  RFG's motion for partial summary judgment should therefore be denied as

to KeyBank's duty to mitigate defense.

Page 27 - FINDINGS AND RECOMMENDATION

3.      **Lack of Standing and Real Party in Interest**

RFG argues that is has been harmed and that its harms would be redressed by a favorable result in this action, and on that basis argues both that it is a real party in interest and that it has standing to bring this action. KeyBank, for its part, argues that RFG was just a "conduit" for the funds of investors (including Rugg) who are not parties to this action. KeyBank argues that those investors are the real parties in interest with standing to bring this action, rather than RFG.

Neither party has offered evidence into the record in support of its position. Because there are, in consequence, unresolved questions of material fact as to these affirmative defenses, RFG's motion for partial summary judgment should be denied as to KeyBank's lack of standing and real party in interest defenses.

## II.    **KeyBank's Motion to Strike**

KeyBank moves to strike, pursuant to Federal Civil Procedure Rule 12(f), to strike from the docket certain evidence offered by RFG. Rule 12(f) permits the courts to "strike *from a pleading* an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f) (emphasis supplied); *see also*, *e.g.*, *Sidney-Vinstein v. A.H. Robins Co.*, 697 F.2d 880, 885 (9th Cir. 1983) ("[u]nder the express language of the rule, only pleadings are subject to motions to strike"); *United States v. Crisp*, 190 F.R.D. 546, 550 (E.D. Cal. 1999) ("[a] motion to strike is limited to pleadings"). RFG's proffered evidence is not contained within a pleading. As such, the evidence is outside the scope of what may be stricken pursuant to Rule 12(f).

Moreover, there is no evident reason for the court to exercise its inherent power to control its docket by striking the subject evidence. Inadmissible material contained in any document

offered into evidence by either party will be and has been disregarded by the court.

For the foregoing reasons, KeyBank's motion to strike should be denied.

## CONCLUSION

For the reasons set forth above, KeyBank's motion (#113) for summary judgment should be denied, RFG's motion (#114) for partial summary judgment should be denied, and KeyBank's motion (#139) to strike should be denied.

## SCHEDULING ORDER

The above Findings and Recommendation and Order will be referred to a United States District Judge for review. Objections, if any, are due July 7, 2009. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date. If objections are filed, a response to the objections is due fourteen days after the date the objections are filed and the review of the Findings and Recommendation will go under advisement on that date.

Dated this 23rd day of June, 2009.

  /s/  Paul Papak _____
Honorable Paul Papak
United States Magistrate Judge

Page 29 - FINDINGS AND RECOMMENDATION